UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| INDIANA CARPENTERS PENSION FUND, | ) | |
| INDIANA/KENTUCKY/OHIO REGIONAL | ) | |
| COUNCIL OF CARPENTERS DEFINED | ) | |
| CONTRIBUTION PENSION TRUST FUND, | ) | |
| INDIANA/KENTUCKY/OHIO REGIONAL | ) | |
| COUNCIL OF CARPENTERS WELFARE | ) | |
| FUND, | ) | |
| INDIANA/KENTUCKY/OHIO REGIONAL | ) | |
| COUNCIL OF CARPENTERS | ) | |
| APPRENTICESHIP AND TRAINING FUND, | ) | |
| UNITED BROTHERHOOD OF CARPENTERS | ) | |
| APPRENTICESHIP TRAINING FUND OF | ) | |
| NORTH AMERICA, | ) | |
| INDIANA/KENTUCKY/OHIO REGIONAL | ) | |
| COUNCIL OF CARPENTERS, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 1:18-cv-03176-MPB-RLY |
| | ) | |
| JACK F. HAMMOND, | ) | |
| BRANDY DANIELS, | ) | |
| PARTS FOR LEHRS LLC, | ) | |
| CB MECHANICAL LLC, | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER ON CROSS MOTIONS FOR PARTIAL SUMMARY JUDGMENT**

The question currently before the court is whether two individuals and two limited

liability corporations are successors-in-interest for a previous limited liability company's unpaid

fund contributions and deductions, a portion of which has now become collectable via two

unpaid judgments and the remainder in the form of an Audit Variance. Now, Plaintiffs—several

employee benefit funds within the meaning and subject to ERISA ("the Funds") and

Indiana/Kentucky/Ohio Regional Council of Carpenters ("the Union") (collectively,

"Plaintiffs")—have moved for partial summary judgment with respect to Counts I, II, III, and IV.

1

(Docket No. 39). Defendants—Jack F. Hammond, Brandy Daniels, Parts for Lehrs LLC, and CB Mechanical LLC—have filed a cross-motion for partial summary judgment against Plaintiffs as to Counts I and II. (Docket No. 44). For the reasons that follow, the court **DENIES** Plaintiffs' motion and **GRANTS** Defendants' motion.

## I.      Factual Background

In 1984 JJ Day, Inc. was incorporated with Jack Hammond as the sole owner, officer, shareholder, and director. (Docket No. 12 at ECF p. 3, ¶ 3; Docket No. 31 at ECF p. 3, ¶ 3; Docket No. 41-3 at ECF p. 17). JJ Day produced new and removed/rebuilt the worn parts for glass houses, and produced lehrs,[1] coating hoods, and associated equipment used for annealing glass products as well as moving heavy machinery. (*Id.*). On July 20, 2006, JJ Day was a signatory, via Jack Hammond's signature, to a Memorandum of Agreement ("MOA") with the Union, which bound JJ Day to the Union's master collective bargaining agreement ("CBA") and to the Plaintiffs' Trust Funds' Agreements and Declarations of Trust ("Trust Agreements"). (Docket No. 12 at ECF p. 3, ¶ 4; Docket No. 31 at ECF p. 3, ¶ 4; Docket No. 41-3 at ECF pp. 65–66). Plaintiffs' Trust Funds are employee benefit funds subject to ERISA. (Docket No. 12 at ECF p. 2, ¶ 1; Docket No. 31 at ECF p. 2, ¶ 1). Thus, JJ Day was obligated to pay contributions and deductions for each hour of covered work performed by its union employees. (Docket No. 12 at ECF pp. 3–4, ¶ 5; Docket No. 31 at ECF pp. 3–4, ¶ 5).

JJ Day became delinquent in its payment of the contributions and deductions owed to the Trust Funds and the Union. (Docket No. 12 at ECF p. 4, ¶ 7; Docket No. 31 at ECF p. 4, ¶ 7; Docket No. 41-3 at ECF p. 67). On October 28, 2016, a Default Judgment was entered for

---

[1] A lehr is a big oven which anneals (takes the stress out of) pieces of glassware molded by an IS (Individual Sections) machine. (Docket No. 41-3 at ECF pp. 12–16).

Plaintiffs and against JJ Day and Hammond in Case No. 1:15-cv-1862-SEB-DKL ("First Lawsuit")—which brought allegations for unpaid contributions and deductions from June 1, 2015 to November 1, 2015—in the amount of $50,592.75. (Docket No. 12 at ECF pp. 5–6, ¶¶ 8–10; Docket No. 31 at ECF pp. 5–6, ¶¶ 8–10). This judgment remains unpaid. (*Id.*). On July 13, 2016, an Agreed Judgment was entered in favor of Plaintiffs and against JJ Day in Case No. 2:16-cv-1873-TWP-MJD) ("Second Lawsuit")—which brought allegations for unpaid contributions and deductions from December 1, 2015 through July 12, 2016—in the amount of $84,237.11 against JJ Day and $7,604.92 against Hammond. (Docket No. 12 at ECF pp. 7–8, ¶¶ 11–12; Docket No. 31 at ECF pp. 7–8, ¶¶ 11–12). A total of $2,070 has been paid on the delinquent deductions included in the Agreed Judgment.

Plaintiffs' auditor conducted an audit of JJ Day's payroll records for the period of January 1, 2012 through May 31, 2015 ("Audit"). The final Audit results, after revision, found that JJ Day owes $61,100.47 to the Plaintiffs' Pension Fund, Welfare Fund, Annuity Fund, and JATC for the Audit Period in delinquent contributions, interest, liquidated damages and audit fees. (Docket No. 41-1 at ECF p. 1, ¶ 4). Once Plaintiffs' Auditor completed its Audit, the Law Offices of Paul T. Berkowitz & Associates, Ltd., utilizing the unpaid work hours identified in the Audit, performed additional calculations to identify amounts owed to the Union for deductions and other contributions for the Audit Period. (Docket No. 41-2 at ECF p. 2, ¶ 7). These calculations identified an additional $9,931.36 owed to the Union for deductions, contributions, interest and liquidated damages. (*Id.*). Thus, the total "Audit Variance" is $71,031.83. (*Id.*, ¶ 9). In sum, the amount still owed by JJ Day on the two Judgments and the Audit Variance is $203,791.69.

Hammond has been involved in the glass industry since the 1970s and has received

international schooling and training for electrical and gas combustible systems for glass products. (Docket No. 41-3 at ECF pp. 7–9). Only one or two companies in the United States provide the services that Hammond could provide after his training. (*Id.* at ECF p. 9).  Using Hammond's knowledge and designs, JJ Day designed and built lehrs from scratch that most companies never offered. (Docket No. 41-3 at ECF p. 16). JJ Day would also buy parts and components from other vendors and combine them with its own products to build its own creations, and rebuild and repair its customers' lehrs and already existing products and components, such as combustible systems and electrical systems. (Docket No. 41-3 at ECF pp. 19–28). JJ Day repaired other brand name lehrs, including Bowman Lehrs, Pennekamp Lehrs, Antonini Lehrs, Old Emhart Lehrs, and service and combustible lehrs. (Docket No. 41-3 at ECF pp. 29–30). Finally, JJ Day moved heavy machinery like set injection machines. (Docket No. 41-3 at ECF pp. 18–19, 30).

At one point, JJ Day had sixty to seventy employees. (Docket No. 41-3 at ECF p. 31). Hammond was responsible for hiring and overseeing the training of the personnel using the same training he received internationally. (*Id.*). Employee's positions included field supervisors, who installed items in the field, and shop foremen, who stayed back at the shop where products were created. (Docket No. 41-3 at ECF pp. 31–32). Hammond was originally involved in JJ Day's ordering, taking orders, and shipping and, even once those roles were turned over to employees, he continued to provide oversight. (Docket No. 41-3 at ECF pp. 39–41). In December 2016, the IRS shut down JJ Day due to tax delinquencies. (Docket No. 41-3 at ECF pp. 50–60). Immediately upon its closure by the IRS, JJ Day's landlord locked the doors at its facility and precluded any further access to its property or equipment. (Docket No. 45-1 at ECF p. 2).

In January 2017, after learning JJ Day had closed, Brandy Daniels (Hammond's niece)

called Hammond and offered to open her own companies if Hammond would train her. (Docket No. 41-4 at ECF p. 11). On January 12, 2017, Daniels organized CB Mechanical, LLC and Part for Lehrs, LLC ("the Companies") as the sole owner. (Docket No. 12 at ECF p. 11, ¶¶ 20–21; Docket No. 31 at ECF p. 11, ¶¶ 20–21; Docket No. 41-4 at ECF p. 16). Daniels had been around Hammond since her childhood and lived with him from 1993 to 1995 while she was in high school. (Docket No. 41-4 at ECF p. 9). During other periods, Daniels was around Hammond about monthly at family gatherings and would occasionally ask questions or overhear conversations regarding JJ Day. (Docket No. 41-3 at ECF pp. 77–83; Docket No. 41-4 at ECF p. 9).

Part for Lehrs is also an original equipment manufacturer ("OEM") that manufactures about 60% of its parts and sources the remainder from others and sells them to customers that have lehr ovens. (Docket No. 41-4 at ECF pp. 12, 19). CB Mechanical services all of the existing lehrs at their customer's facilities. (Id. at ECF p. 12–13). Other than working for JJ Day for six months to one year in 1996 (shortly after graduating from high school), Daniels had no experience or training in the industry. (Docket No. 41-4 at ECF pp. 7–10). Hammond provided Daniels with all of her training regarding the lehr industry after Daniels formed the companies in January 2017. (Id. at ECF p. 10).

Daniels asked Hammond to become involved with the Companies to provide his knowledge and experience. (Docket No. 41-3 at ECF p. 89). Hammond advised and consulted on various aspects of the business, including production processes and specifications, job site consulting, and the types of people to hire. (Docket No. 41-3 at ECF p. 89, 102–103, 113–114). Hammond spent about two weeks each month consulting for the new Companies for the first six to eight months. (Docket No. 41-3 at ECF p. 102; Docket No. 41-4 at ECF pp. 33–34).

Thereafter, Hammond's on-site presence is less frequent, but he continues to provide consulting a couple times a month. (Docket No. 41-3 at ECF p. 102; Docket No. 41-4 at ECF p. 34). Hammond uses a title Senior Estimator/Sales & Marketing Director and has an email address of "jackcbmechanical@yahoo.com." (Docket No. 41-3 at ECF pp. 98–101, 191; Docket No. 41-4 at ECF pp. 38–39). He was given that title because of his connections in the industry. (Docket No. 41-3 at ECF p. 99). Neither company has ever compensated Hammond for his consulting work. (Docket No. 41-3 at ECF p. 115).

Hammond testified that two individuals contributed to the companies' original financing, likely more than $100,000, but that he was not one of the contributors. (Docket No. 41-3 at ECF p. 103–104). Daniels testified that in the spring of 2017, Hammond lent the companies $100,000 to cover payroll, which was eventually repaid. (Docket No. 41-4 at ECF pp. 42–43). She did not know where Hammond got this money from. (*Id.*). From June to August 2017, Daniels signed three company checks for payments to the Union related to the aforementioned judgments and Hammond later repaid the companies for these checks. (Docket No. 41-3 at ECF pp. 116–119). Daniels had no knowledge that JJ Day had these debts or was even bound by the union's CBA until she wrote the first check. (Docket No. 41-4 at ECF p. 38). The Companies serve a large number of JJ Day's former customers. For instance, the Companies' four largest customers, who now provide over half of the new companies' work, were referred by Hammond. (Docket No. 41-3 at ECF pp. at ECF p. 107, 125–126; Docket No. 41-4 at ECF p. 31–32). The Companies do mainly what JJ Day did. (Docket No. 41-3 at ECF pp. 109–110, 126, 129, 132; Docket No. 41-4 at ECF p. 32–33).

The Companies' combined Facebook page advertises that the Companies do manufacture lehrs and touts "30+ years of experience in making & servicing lehrs." (Docket No. 41-4 at ECF

pp. 65–72). The Companies do not use any of JJ Day's equipment, other assets, or former facilities. (Docket No. 45-1 at ECF p. 2). JJ Day's equipment was all sold at auction by his former landlord to satisfy a judgment obtained against JJ Day. (Docket No. 41-3 at ECF p. 130; Docket No. 45-1 at ECF p. 3). Whether JJ Day's union personnel did work like what the Companies provide is disputed by the parties. Hammond avers that his union personnel did work unrelated to lehrs, which the Companies do not provide similar services for to date. (Docket No. 41-3 at ECF p. 131; Docket No. 45-1 at ECF p. 2). A former JJ Day employee and millwright worker testified that he and the other millwright employees were often called on to do lehr and other product-related work like what the Companies provide today. (Docket No. 48-2).

## II.    Standard of Review

Summary judgment is appropriate when the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding whether genuine issues of material fact exist, the court construes all facts and draws all reasonable inferences in a light most favorable to the non-moving party. *See id.* at 255. If, after drawing all reasonable inferences from the facts in favor of the non-movant, genuine doubts remain, summary judgment is inappropriate. *See Shields Enter., Inc. v. First Chicago Corp.*, 975 F.2d 1290, 1294 (7th Cir. 1992). However, neither the mere existence of some alleged factual dispute between the parties, *id.* at 247, nor the existence of some metaphysical doubt as to the material facts, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), will defeat a motion for summary judgment. *Michas v. Health Cost Controls of Illinois, Inc.*, 209

F.3d 687, 692 (7th Cir. 2000).

### III.    Discussion

The Plaintiffs argue that Defendants are liable for JJ Day Inc.'s debts as a successor. The successorship doctrine provides an exception from the general rule that a purchaser of assets does not acquire a seller's liabilities. *See Chaveriat v. Williams Pipe Line Co.*, 11 F.3d 1420, 1424 (7th Cir. 1993). While most states have adopted exceptions to the general no-liability rule, successor liability under federal common law is even broader than these state exceptions in order to protect federal rights or effectuate federal policies. *Chicago Truck Drivers, Helpers & Warehouse Workers Union (Indep.) Pension Fund v. Tasemkin, Inc.*, 59 F.3d 48, 49 (7th Cir. 1995). Successor liability is an equitable doctrine and "in light of the difficulty of the successorship question, the myriad factual circumstances and legal contexts in which it can arise, and the absence of congressional guidance as to its resolution, emphasis on the facts of each case as it arises is especially appropriate." *Howard Johnson Co., Inc. v. Detroit Local Joint Exec. Bd.*, 417 U.S. 249, 256 (1974).

"[S]uccessor entities can be liable for multiemployer pension contributions if (1) there is sufficient continuity between the two companies and (2) the successor company had notice of the predecessor's liability." *Moriarty v. Svec*, 164 F.3d 323, 327 (7th Cir. 1998) (also providing that federal common law preempts state common law on this issue in the ERISA context); *see also*, *Sullivan v. Running Waters Irrigation, Inc.*, 739 F.3d 354, 357 (7th Cir. 2014) ("Running Waters"). In terms of continuity the Seventh Circuit has found it "most helpful to assess the continuity of relevant factors in six categories: ownership, physical assets, intangible assets, management and workforce, business services, and customers." *Indiana Elec. Workers' Pension Benefit Fund v. ManWeb Servs., Inc.*, 884 F.3d 770, 778 (7th Cir. 2018) ("*ManWeb II*"). As to

notice, it "can be proven not only by pointing to facts that conclusively demonstrate actual knowledge, but also by presenting evidence that allows the fact finder to imply knowledge from the circumstances." *Upholsterers' Int'l Union Pension Fund v. Artistic Furniture of Pontiac*, 920 F.2d 1323, 1329 (7th Cir. 1990).

### A.  Count I and Count II: Jack Hammond and Brandy Daniels, Individually and d/b/a CB Mechanical LLC and Part for Lehrs LLC as Successors of JJ Day

Plaintiffs and Defendants have each filed dispositive motions on Counts I and II, which apply the successor liability theory to Jack Hammond and Brandy Daniels as individuals. Plaintiffs argue that the undisputed facts establish both the continuity of operations and notice to the two individuals. (Docket No. 40 at ECF pp. 18–36). Defendants argue that *any* business that was carried on was done by the Companies, and not by either Hammond or Daniels, individually. (Docket No. 45 at ECF pp. 5–9).

The court turns first to Defendants' argument that Hammond and Daniels cannot be held individually liable under the successor liability. This issue was briefly discussed in the court's entry on Defendants' motion to dismiss, but as the court acknowledged then, the "analysis [was] limited because Defendants' argument . . . [did] not address the line of case law permitting successor liability against individuals." (Docket No. 27 at ECF p. 12, n. 7). While claims against individuals as successors have been pursued in other cases, none of those cases are akin to the facts here.

For example, in *Int'l Union of Operating Eng'rs, Local 150, AFL-CIO v. Centor Contractors, Inc., et al.*, involved an Illinois partnership that was liable on the award as either the successor or the alter ego of the corporation, Centor. 831 F.2d 1309 (7th Cir. 1987). The Seventh Circuit held "[b]ecause Soil Contractors is not a corporation and because the individual defendants were its only partners at the relevant time, the liability of the partnership was a

liability of the partners by operation of law." *Id.* at 1310. The Seventh Circuit further explained that "[i]n imposing liability on the individual defendants, the district court did not, as appellants suggest, 'pierce the corporate veil.' After they dissolved [the corporation], there was no veil left. The court merely held the successor partnership liable, and, by operation of law, its partners." *Id.* at 1313. Though addressing liability as a common employer rather than a successor, in *Cent. States, Se. and Sw. Areas Pension Fund v. Nagy*, the Seventh Circuit was asked to determine the individual defendant's personal liability where his personally owned companies had already conceded liability in district court. 714 F.3d 545 (7th Cir. 2013). The Seventh Circuit held that "the answer as to personal liability turns on whether [the individual defendant] engaged in unincorporated 'trade or business' under common control with Ready Mix. If so, he is personally liable for the payments." *Id.* at 546–47.

Our sister district courts have held similarly. For instance, in *Bd. of Trs. of Auto. Mechs.' Local No., 701 Union and Industry Pension Fund v. Moroni*, the district court denied a Rule 12(b)(6) motion holding, in relevant part, that successor liability was sufficiently pled from the original entity to the sole proprietorship where there was notice (via the individual who was the alleged *de facto* owner of all entities) and there were no major changes in operation. 905 F. Supp. 2d 846, 853 (N.D. Ill. 2012). Moreover, the court specifically noted that the individual defendant was a proper defendant "because ERISA regulations treat an individual who owns the entire interest in an unincorporated trade or business [i.e., a sole proprietorship] as his own employer." *Id.* at 852 (citing 29 C.F.R. 4001.3(a)(3)). Plaintiffs rely on *Trustees of NECA-IBEW Pension Ben. Trust Fund v. Springman*, for the proposition that individuals can be held liable as successors even when only corporate entities are involved. 2009 WL 1089549 (S.D. Ill. Apr. 22, 2009). However, that is not what the court in *Springman* held. The court based its finding of

personal liability on an alter ego theory, not a successor theory.  The individual, Mr. Springman, argued that even if the subsequent entities are the alter ego of the preceding entity, this fact did not provide a basis to hold Mr. Springman individually liable. *Id.* at *8. The plaintiffs responded that Mr. Springman is individually liable "for Springman Electric's unpaid contributions under the successor theory." *Id.* However, the court analyzed Mr. Springman's potential liable under Illinois's alter ego law. *Id.* ("Because ERISA contains no special rules pertaining to officer or shareholder liability, the Court follows Illinois law on the issue. Under Illinois law, officer or shareholder liability is posited on a finding of the prerequisite conditions discussed above in the alter ego analysis.") (internal citations omitted). The court concluded that it found the prerequisites of alter ego liability were met and thus, it was appropriate to reach Mr. Springman individually. *Id.* at *9. In other words, while the defendants raised Mr. Springman's liability under a successorship theory, the district court applied an alter ego analysis.[2]

In sum, no case law has been cited, nor was found by this court, that applied successor liability to an individual where it would require the court to set aside or ignore an entities corporate form. Each individual's personal liability either sounded in some other theory (i.e., alter ego) or was a result of an operation of law (i.e., due to a sole proprietorship or partnership's liability). Admittedly, the labor-law doctrine of successorship liability is notably broader than most state law doctrines, but this broadening calls for a relaxation as to the type of transaction where a purchasing entity may be found liable for a selling entity's labor-law liabilities. *See Artistic Furniture of Pontiac*, 920 F.2d at 1325–26. This broadening was necessary to balance "between the need to effectuate federal labor and employment discrimination policies and the

---

[2] The court notes Plaintiffs have raised alter ego theories against Hammond and Daniels as individuals in this matter. (Counts VIII and IX).

need, reflected in the traditional common law rule, to facilitate the fluid transfer of corporate assets." *Id.* In other words, the federal doctrine relaxed the type of transactions between two entities. It did not necessarily relax the traditional rules of who could be held liable for those entities' liabilities as an operation of law.

Alternatively, Plaintiffs argue that there is evidence that Hammond and Daniels acted individually. Plaintiffs cite Hammond's request to JJ Day employee, Timothy Younger, to start a new company like JJ Day; Hammond's consortium with Daniels to "perpetuate his operations" through her companies; and his continued servicing of his customers as evidence that Hammond "personally and essentially individually continued the same business operation." (Docket No. 48 at ECF p. 5 (citing Docket No. 48-2; Docket No. 41-3 at ECF pp. 7–10, 42–49, 125–126)). Younger's affidavit does not assert any personal knowledge that Hammond continued to engage in business as a sole proprietor after JJ Day was closed in December 2006. Indeed, the implication of Hammond's request to Younger is that Hammond was not interested in engaging in business and was looking for someone to fill the void created by the closing of JJ Day. The remainder of the alleged activity Hammond completed on behalf of the Companies. In fact, Hammond testified that JJ Day did not complete any orders that were outstanding upon its closing and that he did not know who completed them. (Docket No. 41-3 at ECF pp. 63–64). Hammond notified his larger clients that JJ Day had been shut down, but he did not initially refer them to anyone. (*Id.* at ECF p. 64). This is uncontradicted evidence that Hammond did not *individually* continue JJ Day's business operations upon its closure.

Plaintiffs argue that Daniels has openly held herself out as a sole proprietor doing business as any number of entities, including "CB Mechanical," "Part for Lehrs," "CB Mechanical Part for Lehrs," and "The Lehr Company" in addition to the names of the two

12

Defendant companies. (Docket No. 48 at ECF pp. 5–6). To support the statement, Plaintiffs cite

to CB Mechanical LLC's Facebook page. (Docket No. 41-4 at ECF pp. 65–72). However, the

Facebook page's name is clearly CB Mechanical LLC. The main image lists both CB

Mechanical and Parts for Lehrs as LLCs. The page is devoid of any reference to Daniels,

individually, doing business. Plaintiffs' argument that Daniels' alleged lack of acumen and skills

in the glass industry, the "undercapitalization" of the companies, and the dependency on

Hammond results in Daniels being individually a successor of JJ Day is undeveloped and

unpersuasive. Likewise, Plaintiffs' attempts to liken this case to *Springman* are unconvincing

because in *Springman* Ms. Springman, herself, was "an employer within the meaning of ERISA"

because she signed the letters of assent to the collective bargaining agreement. 2009 WL

1089549 at *3. Moreover, there was a period of time where Ms. Springman and her son were the

owners of an unincorporated entity. *Id.* That entity was eventually incorporated but, after its

involuntary dissolution, Ms. Springman and her son continued to engage in business under

variations of the corporation's name. *Id.* These facts are entirely different than the facts before

this court.

There is simply no evidence that either Hammond or Daniels billed any customer under

their individual name or otherwise undertook, individually, to engage in business. The business

at issue has been conducted under the corporate umbrellas. Plaintiffs' claims under Counts I and

II for successor liability against the individual Defendants fail for the reason that there is no

genuine dispute that neither Hammond nor Daniels, individually, engaged in business. For the

foregoing reasons, Hammond's and Daniels's requests for summary judgment on Counts I and II

are **GRANTED**. It follows then, that the Plaintiffs' requests for summary judgment on those

same counts is **DENIED**.

**B.  Count III and Count IV: CB Mechanical LLC and Part for Lehrs LLC as Successors of JJ Day**

Plaintiffs move for summary judgment on Counts III and IV, which apply the successor liability theory to CB Mechanical LLC and Part for Lehrs LLC. Plaintiffs argue the undisputed facts establish both successor factors—continuity and notice. The Companies argue that the successor theory is inapplicable to the facts of this case because there was no transaction between JJ Day and the Companies and because the Companies do not conduct the same work for which JJ Day incurred the contribution liabilities. In addition, Defendants argue that that the undisputed facts do not conclusively prove that the successor factors have been met.

Legal authority has not directly addressed whether a *formal* transaction between a predecessor entity and a putative successor is necessary in order to apply successor liability. To be sure, one reason notice of the liability is a significant factor in allowing a departure from the general rules regarding successor liability is so that the putative successor has the ability to factor in that liability when it negotiates the price for the company. *See Artistic Furniture of Pontiac*, 920 F.2d at 1327 (finding notice of the liability to be critical "because of our belief it would be inequitable to hold a successor liable when it was unable to take the liability into account when negotiating the acquisition price."). Thus, Defendants argue that without a formal sale the Companies never had an opportunity, even if we assume continuity and notice, to negotiate for the liability. Such a conclusion is too narrow a reading of the relevant authority. In *Running Waters*, the Seventh Circuit made clear that "*Artistic Furniture* [did] not require a formal purchase of assets to establish successor liability in the ERISA context." 739 F.3d at 357. And in explaining the rationale behind the six continuity factors in *ManWeb II*, the Seventh Circuit stated that "the ingenuity often shown in reorganizing businesses and their assets [requires] courts [to] consider the totality of the circumstances to determine continuity, focusing on the

14

particulars of the case and the nature of the liability at issue." 884 F.3d at 777. Defendants'
requirement for a *formal* transaction between the entities is conflicted with the policies that
require the court to look beyond the corporate reorganization to what actually happened between
the two companies and is, thus, unpersuasive.

Next, the Companies argue successor liability is inapplicable here because neither
company engages in the business for which JJ Day employed union workers. They admit that
they have been unable to find any authority on whether the putative successor must be engaged
in the *exact* type of business for which the predecessor incurred the liability in order for
successor liability to be found. The Companies cite to Hammond's affidavit that JJ Day's union
personnel were engaged only in the business of moving equipment and, since the Companies do
not engage in that type of service, successor liability cannot apply to JJ Day's contribution
liabilities. (Docket No. 45-1 at ECF p. 2, ¶ 4). Yet a former JJ Day employee and millwright,
Timothy Younger, contradicts that statement. (Docket No. 48-2). Younger was employed by JJ
Day for twenty-two years and during the later years he operated in a supervisor/manager
capacity. (Docket No. 48-2 at ECF p. 1, ¶¶ 4–5). Younger avers that from 2012 to 2016 JJ Day
regularly employed four to five union millwrights who worked in the shop facilities, field
operations, sold lehrs, built new lehrs, and rebuilt and repaired existing lehrs. (*Id.* at ECF p. 2, ¶
7). Thus, the court need not decide whether the Companies must be engaged in the same services
for which JJ Day employed union personnel in order to apply successor liability because
Plaintiffs have presented a genuine issue of material fact on this issue.

With those preliminary issues addressed, the court turns to whether the undisputed facts
establish a sufficient indicia of continuity between JJ Day and the Companies and whether the
Companies had notice of JJ Day's liability. In addressing continuity, the court considers the six

factors set forth in *ManWeb II*: ownership, physical assets, intangible assets, management and workforce, business services, and customers.

There is no shared ownership between JJ Day and the Companies. Hammond was the sole owner, officer, shareholder, and director of JJ Day, Inc. (Docket No. 12 at ECF p. 3, ¶ 3; Docket No. 31 at ECF p. 3, ¶ 3; Docket No. 41-3 at ECF p. 17). Daniels is the sole owner of the Companies. (Docket No. 12 at ECF p. 11, ¶¶ 20–21; Docket No. 31 at ECF p. 11, ¶¶ 20–21; Docket No. 41-4 at ECF p. 16). While Hammond did provide around $100,000 to cover payroll in the spring of 2017, Daniels testified that money was repaid, and no evidence has been cited to contradict that statement. (Docket No. 41-4 at ECF pp. 42–43). This factor does not support successor liability for the companies.

There is no dispute that the Companies do not use any of JJ Day's equipment, other assets, or former facilities. (Docket No. 45-1 at ECF p. 2). JJ Day's equipment was all sold at auction by his former landlord to satisfy a judgment obtained against JJ Day. (Docket No. 41-3 at ECF p. 130; Docket No. 45-1 at ECF p. 3). Thus, these facts weigh against successor liability.

The next factor is intangible assets. Hammond and his skill set were clearly vital to the Companies' success. Daniels testified she called Hammond and said if he would train her, then she would start these companies. (Docket No. 41-4 at ECF p. 11). Hammond received extensive international training and when he started JJ Day it was one of the only companies in the United States that could provide Hammond's unique skill set. (Docket No. 41-3 at ECF pp. 7–9). The Companies not only gained Hammond's knowledge and skill set, but they also touted that knowledge and skill set in their advertisements including stating: "30+ years of experience in making & servicing lehrs." (Docket No. 41-4 at ECF pp. 65–72). The Companies also received information regarding suppliers, contracts, customer lists and data, and bidding processes, among

other vital information. These are various factors discussed in favor of successor liability in

*ManWeb II*. 884 F.3d at 779. Hammond testified he was given the title Senior Estimator/Sales

and Marketing Director in part because several people knew him within the industry. (Docket

No. 41-3 at ECF p. 99).

On the other hand, there is no evidence the Companies have capitalized on JJ Day's

goodwill. This is distinguishable from *ManWeb II* where it was established that ManWeb was

trying to capitalize on the predecessor's, Freije, name by maintaining the Freije logo on outgoing

mail and by issuing a press release describing the transaction as an acquisition and merger, which

the court concluded was "the language of continuity." *Id.* Even several years after the

ManWeb/Freije transaction, ManWeb was doing business as Freije-RSC Engineered Solutions.

This evidence, combined with the type of evidence that does exist in this case, led the Seventh

Circuit to conclude the "continuity of the tradename and related intangible assets, together with

the intention behind it, weighs strongly in favor of continuity of business operations." *Id.* at 779–

80.

The intangible assets do weigh in favor of continuity of business operations, although—

admittedly—the facts are not as strong as *ManWeb II*. Plaintiffs also exaggerate the holding of

*ManWeb II* to say that "the Court nevertheless found other factors established continuity."

(Docket No. 40 at ECF p. 19 (citing *ManWeb II*, 884 F.3d at 779–783)). This conclusion ignores

the procedural posture of the case. The Seventh Circuit vacated and remanded the district court's

grant of the putative successor-in-interest's motion for summary judgment. The appellate court

instructed that "[o]n remand, the district court should reweigh the successor liability factors in

light of the considerations [i.e., the factors] we have identified." *Id.* at 784. Thus, *ManWeb II*

does not establish that facts akin to those presented in that case establish at the summary

judgment stage that there is no genuine question of fact on the continuity factor.

The fourth factor is continuity of workforce, which *ManWeb II* advised to examine in separate categories, including management, supervisors, and rank-and-file employees. *Id.* at 780. While Hammond and Daniels consistently testified that Hammond was a "consultant," he and Daniels also created the title of Senior Estimator/Sales and Marketing Director for him because he was initially the only one with the knowledge and because he had supplier and customer contacts in the industry. (Docket No. 41-3 at ECF p. 98–99). This portrayal of Hammond as a higher-level individual with the Companies indicates that his continuity was important to the Companies and thus, I find there is a continuity of management.

While Hammond was responsible for the hiring at JJ Day, the testimony was that Daniels did all the hiring, firing, and personnel decisions at the Companies with only some input from Hammond. (Docket No. 41-3 at ECF p. 100; Docket No. 41-4 at ECF p. 17). Daniels testified that she is responsible for every employee, but mainly her two project managers who report to her. (Docket No. 41-4 at ECF p. 18). Daniels did not name those two project managers nor was it established whether they were former JJ Day employees. While Daniels did work six months to one year with JJ Day right after she graduated from high school there is no indication that she held a supervisory role with JJ Day. (Docket No. 41-3 at ECF p. 79) (Hammond testifying that Daniels answered the phone, took orders, and reviewing proposals); (Docket No. 41-4 at ECF pp. 8–9). On this record, I find that there is no substantial continuity of supervisors.

At one time JJ Day employed sixty to seventy individuals. (Docket No. 41-3 at ECF p. 31). There was no testimony as to the number of JJ Day's employees around the time of its closure. Former employee Younger avers that there were four to five union millwrights at JJ Day from 2012 through 2016 (i.e., the period of delinquency). (Docket No. 48-1 at ECF p. 6). The

Companies each employ the same ten employees, two of which worked for JJ Day. (Docket No. 41-4 at ECF pp. 19–20). These two do not include Daniels (who once worked for JJ Day) and Hammond (who is not included in the ten as the Defendants consider him a "consultant"). In other words four of the eleven individuals currently involved in the Companies were previously employed by JJ Day. The fact that these two employees joined the Companies' relatively small workforces is not insignificant. More important in this context is the retention of a key person from JJ Day, Hammond. He possessed unique knowledge, skills, and abilities not present in the Companies prior to his involvement. *See ManWeb II*, 884 F.3d at 780. On this record, I find continuity of employees, including the continuity of key individuals, tend to indicate a continuity of workforce.

The fifth factor is continuity of business services. The Companies were incorporated so Daniels could sell parts for lehrs and then do service work on lehrs. (Docket No. 41-4 at ECF p. 16). Lehrs is also an original equipment manufacturer that manufactures some of its parts and sells them to customers already having lehr ovens at their facilities. (*Id.* at ECF p. 12). While Defendants contend that the Companies operate on a smaller scale than JJ Day, both in terms of size and because the Companies do not manufacture complete lehrs nor do they move machinery, Daniels testified that "everything that CBM or Lehrs does JJ Day also did." (*Id.* at ECF pp. 32–33). The Companies have created, manufactured or performed service on a number of the same products that JJ Day had produced including the AP5 coating hood; the mold oven; controls and instrumentation (including a PLC), and service work on the Bowman, Antoninis, JJ Day, and decorating lehrs (Docket No. 41-3 at ECF pp. 125–128). While Hammond denies the Companies have the capability to manufacture an entire lehr, the Companies' own Facebook page advertises that the companies do manufacture lehrs. (*Id.* at ECF pp. 131, 134, 136, 198).

19

Thus, comparison of business services between JJ Day and the Companies weighs in favor of continuity.

The final factor is a continuity of customers. The Companies service a large number of JJ Day's former customers providing the same parts and services. A list of JJ Days customers from its creation to close shows that, with exception of two entities, the Companies have done work for all of the former JJ Day customers. (Docket No. 41-3 at ECF pp. 44–49, 155; Docket No. 41-4 at ECF pp. 31–32). The four largest carry-over customers, who now provide over half of the new Companies' work, were referred by Hammond. (Docket No. 41-4 at ECF pp. 31–32). He likely referred others, if not all of JJ Day's former customers. (Id. at ECF p. 124). Both Hammond and Daniels to JJ Day's old customers that Hammond would be consulting for the new companies. (Docket No. 41-3 at ECF p. 123–125; Docket No. 41-4 at ECF p. 38). This final factor weighs substantially in favor of successor liability.

In sum, four of the six factors weigh in favor of successor liability, with continuity of intangibles, business services, and customers being particularly strong. However, "[i]solated individual factors must be balanced as a whole to determine if successor liability is appropriate. The presence or absence of any one factor does not compel a particular conclusion." ManWeb II, 884 F.3d at 783. Construing all reasonable inferences in the Defendants' favor as the non-moving party, the court cannot conclude that no reasonable jury would find insufficient continuity. On these facts, a conclusion that there is no genuine dispute as to continuity at the summary judgment stage is premature.

The second element in establishing successor liability is notice. As discussed in Artistic Furniture of Pontiac:

> Notice can be proven not only by pointing to facts that conclusively demonstrate actual knowledge, but also by presenting evidence that

> allows the fact finder to imply knowledge from the circumstances.
> In *Golden State*, for example, the Supreme Court affirmed the
> finding of the Board and the Court of Appeals that the presence at
> negotiations between the two companies of an individual who was
> the predecessor's manager and became the successor's general
> manager supported the inference that the successor had knowledge
> of the predecessor's unfair labor practice. And in *South Harlan*
> *Coal*, the Sixth Circuit took note of the proximity of the
> predecessor's and successor's business operations, the extensive
> news coverage of the union activity at issue, and the successor's lack
> of credibility in affirming the Board's decision inferring knowledge
> of an unfair labor practice.

*Artistic Furniture of Pontiac*, 920 F.2d at 1329 (internal citations omitted) (citing *Golden State*

*Bottling Co. v. NLRB*, 414 U.S. 168, 173 (1973) and *NLRB v. South Harlan Coal Inc.*, 844 F.2d

380, 385 (6th Cir. 1988)). "Additionally, notice may be imputed to Defendants from the fact that

these entities were family businesses, owned and operated by the mother and son and then by the

father." *Springman*, 2009 WL 1089549, at *4 (citing *Chicago Dist. Coun. of Carpenters Pension*

*Fund v. A.F. McCarthy, Inc.*, 1996 WL 563459, at *7 (N.D. Ill. 1996) (collecting cases where

notice imputed from identity of owners)).

      Plaintiffs have two theories of notice: first, because of Hammond's knowledge of the

liabilities, and second, because of the relationship between Hammond and Daniels. There is no

dispute that Hammond had knowledge of the unpaid and overdue multiemployer fund

contributions and deductions owed by JJ Day to the Plaintiffs. Hammond was the officer, sole

shareholder, and director of JJ Day and he signed the MOA with the Union that expressly bound

the contractor to the then-current CBA and to the Plaintiffs Trust Funds' Agreements and

Declarations of Trust. (Docket No. 41-3 at ECF pp. 7, 16–17). Defendants argue that his

knowledge cannot be imputed on the Companies because he acted as a consultant, not an officer,

director, or manager. However, the case law does not necessarily require the individual who

imputes knowledge to have one of these labels, but only that the individual be part of the putative

successor's "control group." *Artistic Furniture of Pontiac*, 920 F.2d at 1329. It appears that *shortly after* the Companies' initial creation, Hammond was a *de facto* member of the Companies' control groups. He set-up and designed the production processes and specifications, was the senior estimator and the director of sales and marketing, financed the initial payroll through a loan, and was the main source of the Companies' customers. However, it is unclear from Hammond and Daniels' testimony whether as the owner of JJ Day he informed the Companies of the liability before the Companies' creation. *See Id.* (holding question of fact regarding notice where a leader in both the predecessor and putative successor had knowledge, but the evidence was unclear if he informed the putative successor of the liability before the transaction took place and that while those facts could support an inference of knowledge, further record development was required). The record does show that Hammond had at least one or two conversations with Daniels regarding the closure of JJ Day and the potential Companies before she created them. (Docket No. 41-3 at ECF pp. 89–93). Hammond testified that he did not recall everything that was said in the conversation and that he had "very little" instructing on the creation of the companies. (*Id.* at ECF p. 92). While Hammond testified that he never told Daniels JJ Day was in debt, he did tell Daniels that the IRS was closing the company down and then admitted he was "sure" he had mentioned the IRS debt to Daniels at some point. (Docket No. 41-3 at ECF p. 84–85). The record also shows that Daniels had asked questions regarding the business "her entire life." (Docket No. 41-3 at ECF p. 81).

Like in *Artistic Furniture of Pontiac*, these facts do not conclusively prove actual knowledge, but they might support a reasonable inference that members of the Companies' control groups had knowledge of JJ Day's contribution liability. 920 F.2d at 1329. However, whether the facts actually do or do not support such an inference is a question of fact that renders

summary judgment for either party inappropriate.

Plaintiffs' second notice argument is that Daniels's close relation to Hammond, her employment by and years of being around JJ Day, and their financial dealings are sufficient to reasonably infer that she had knowledge of the predecessor's debts owed to the Plaintiffs. (Docket No. 40 at ECF p. 34).[3] Defendants argue that at the very least Daniels's averment that she was not aware of the union liabilities when she created the liabilities creates a question of fact that precludes a finding as a matter of law. (Docket No. 45 at ECF p. 15 (citing Docket No. 45-2 at ECF p. 2, ¶ 9)). Plaintiffs point the court to two district court cases where family relations existed between the predecessor and putative successor companies and the courts granted the plaintiffs' summary judgment motion on the successor issue.

In *Sullivan v. J.S. Sales Plumbing, Inc.*, 1994 WL 55658 (N.D. Ill. Feb. 23, 1994), Gerald Sullivan served as president, sole officer, and sole shareholder of the predecessor corporation, which provided plumbing contracting services. *Id.* at *1–7. The predecessor ceased to do business after a judgment was entered against it for delinquent pension fund contributions. *Id.* Soon thereafter, a putative successor entity was formed with Carol Salem, Gerald's wife, as the sole shareholder. Carol Salem was not a plumber, but a former teacher who was unemployed for over a decade. *Id.* The putative successor entity hired Gerald Salem to do its plumbing jobs, but did not compensate him in any way. *Id.* The district court held that no further development of the record was required as it was clear "as a matter of law" that the putative successor had knowledge of the predecessor's liability. *Id.* at *6. In so concluding, the district court reasoned:

> The Defendant could have argued that some vague question of fact concerning notice remains. It could have, we suppose, submitted the affidavit of Carol Salem to the effect that she knew nothing about

---

[3] Of course, Daniels eventually had actual notice of the liabilities after she signed three company checks to satisfy part of the debts, but that was well after the Companies' creations.

her husband's immense debts when she opened J.S. Sales, but just deciding she wanted to be a plumbing contractor. Of course, such self-serving evidence, standing alone, would have been quite insufficient. Even if such an attempt were made, the Defendant must do more than 'simply show there is some metaphysical doubt as to the material facts.' *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

*Id.* at *7.

In *Central States, Southeast v. Sidney Insulation, Inc.*, 235 F. Supp. 3d 1044 (N.D. Ill. 2017), the daughter of the predecessor's owner and former employee contended that she did not know of the collective bargaining agreement that provided for participation in the pension fund. The daughter had worked for the predecessor entity on two instances, was listed as an officer/director member on the entity's records, and enrolled her subsequent entity in the same pension fund. In granting plaintiffs' summary judgment motion and ruling the successor was liable for the predecessors' pension liabilities, the district court recognized the proposition "that when a successor knew that the predecessor's workers were unionized that knowledge should have alerted him to the possibility of withdrawal liability, which he could have verified by asking the predecessor[.]" *Id.* at 1051 (internal quotations and citations omitted). The district court then concluded:

> But it strains credulity past the breaking point to accept a contention that when [the daughter] was employed at [the predecessor], and as she built her own business that delivers exactly the same services as [the predecessor], she was not 'intimately familiar with [the predecessor's operations.' At the very least [the daughter] must have known the trucking and warehouse workers at [the predecessor] were unionized (note that her brother []—who later went on to work at [the successor] and to own 14 percent of the company—was himself a member of [the union]. And [the successor] employs and is party to a collective bargaining agreement with the same [union] that [the predecessor] dealt with.

*Id.*

24

The record before this court is not as clear as these two cases. Daniels is a niece who only lived with Hammond for a short period of time in high school and worked for the predecessor for no more than a year right out of high school. This is not akin to a wife intimately involved/aware of her husband's finances or a child that had been previously listed as an officer/director/member of the predecessor company on its tax returns and with its filings with the Secretary of State.

On reply, the Plaintiffs provide evidence for this first time that Daniels's ex-husband and father of two of her children was employed by JJ Day as a union millwright during the delinquency period. (Docket No. 48 at ECF p. 17 (citing Docket No. 48-1)). This evidence was presented via an affidavit of Plaintiffs' counsel, Thomas Moss, who collected various court and third-party administrator records. (Docket No. 48-1 at ECF p. 2). Plaintiffs aver that the records show the terms of Daniels's and her ex-husband's Decree of Dissolution and Property Settlement Agreement show that they were each responsible for a portion of the children's health insurance maintained through their respective employers. Plaintiffs cite this evidence to conclude "[i]t is certainly no stretch to understand that Daniels would know about [her ex-husband's] employment and the source of [his] health insurance, how it was to be funded by employer contributions, and that it provided coverage for her children[.]" (Docket No. 48 at ECF p. 17). The court disagrees. Such a conclusion is quite a stretch, especially on a record where Daniels was never questioned on this information nor did the Defendants file a surreply to address the late-submitted evidence. On this record it would not be reasonable to infer as a matter of law that Daniels knew of JJ Day's contribution liabilities because she knew her ex-husband received health insurance benefits through JJ Day.

It may be that the facts in this case support a finding of notice to the Companies (via either Hammond or Daniels) to the trier of fact, but to conclude so at the summary judgment

stage would be premature. Because questions of fact remain on Counts III and IV, Plaintiffs'

request for summary judgment on these counts is **DENIED**.

### IV.   Conclusion

For the foregoing reasons, Hammond's and Daniels's motion for summary judgment on

Counts I and II is **GRANTED**. (Docket No. 44). Plaintiffs' motion for summary judgment on

Counts I to IV is **DENIED**. (Docket No. 39).

**SO ORDERED** this 4th day of May, 2020.

Matthew P. Brookman
United States Magistrate Judge
Southern District of Indiana

Service will be made electronically on all ECF-registered counsel of record via email generated
by the court's ECF system.